[Civ. No. 29388. Second Dist., Div. Four. Dec. 21, 1966.]

SEABOARD FINANCE COMPANY, Plaintiff and Appellant, v. FEDERAL LEASING COMPANY, Defendant and Respondent.

Arthur S. Ecker, Minter & Feder, and Richard H. Share for Plaintiff and Appellant.

Cantillon & Cantillon and James P. Cantillon for Defendant and Respondent.

FOX, J.*—In September 1964, plaintiff-appellant Seaboard Finance Company brought this action against Federal Leasing Company, defendant-respondent, to recover an alleged indebtedness of some $120,000. Plaintiff filed a declaration for attachment in which it stated that defendant's indebtedness had been originally secured, but then asserted that "said security has without any act of plaintiff become valueless and no other security exists." The clerk issued a writ of attachment directed against all of defendant's assets not exempt from execution, and pursuant thereto levy was made. In due course defendant made a motion to dissolve and discharge the writ of attachment upon the ground that plaintiff had security for the indebtedness sued upon, which security was held by plaintiff under a general pledge agreement. Plaintiff filed counteraffidavits and points and authorities in opposition to defendant's motion. Thereupon a trial was had upon the issues thus framed. Both oral and documentary evidence was received at the trial. The court signed and filed a formal order dissolving and discharging the writ of attachment. The court specifically based its order upon a finding that plaintiff was in

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

possession of security under a general pledge agreement and that said security had not become valueless.

The evidence discloses that over a period of some two years plaintiff and defendant engaged in 34 transactions wherein plaintiff made commercial loans to defendant. The transaction between Seaboard and Federal Leasing involved Seaboard's lending the leasing company monies which it used to acquire various types of personal property such as motor vehicles, farm and construction machinery, furnishings, and the like. The properties thus acquired by defendant were then leased to third persons. The leases varied in their term and rental, dependent upon the cost and durability of the property involved. The leases provided that, upon termination thereof, the property leased either was returned to the possession of the leasing company or the lessee paid the lessor an additional specified sum in consideration for which the leasing company transferred title to the lessee. At the outset of the trial it was stipulated that Exhibits A-1 through A-34, both inclusive, constituted the records of all of the transactions between Seaboard and Federal Leasing. It was also stipulated that the transaction involved in Exhibit A-1 was typical of all of the transactions and that the form of the documents therein utilized was substantially duplicated in each of the other transactions.

In consideration for each loan made by Seaboard to Federal Leasing the latter company delivered to Seaboard the following documents: (a) Federal Leasing's note payable to Seaboard in the amount of the loan, (b) a chattel mortgage covering the property purchased for lease securing the aforesaid promissory note, (c) an assignment to Seaboard of the lease and rentals of the property purchased by Federal Leasing with the money borrowed from Seaboard, (d) personal guarantees of performance of the lease signed by the stockholders if the lessee was a corporation, and (e) an assignment of a demand promissory note signed by the lessee in favor of Federal Leasing in the gross amount of monies payable to Federal Leasing under the lease.

There was testimony that early in the course of their dealings Seaboard requested Federal Leasing to sign a general dealer agreement. One of the reasons for attempting to obtain Federal Leasing's signature to the general dealer agreement was to ''criss-cross this collatoral,'' which is an arrangement by which the good transactions may also be applied against the bad transactions. Mr. Shipton, president of Federal Leas-

ing, refused to sign the general dealer agreement because he felt that its provisions gave Seaboard too much authority over the conduct of Federal Leasing's business.

Late in 1963, when one of the transactions between the parties became in default and there was a question concerning the sufficiency of the collateral, Mr. Lightfoot, a vice president of Seaboard, procured Mr. Shipton's signature to the general pledge agreement (Exhibit B) as an alternative to the general dealer agreement. According to Mr. Shipton, it was his understanding that, by executing the general pledge agreement, he was making available the entire equity position of Federal in all of the 34 leases to Seaboard as security against any loss that might be sustained in any one or more of these transactions.

Sometime after the general pledge agreement was signed Federal Leasing paid over to Seaboard $20,000 and also assigned to it an unencumbered lease worth $15,000 that Federal owned, upon which the Southern California Edison Company was lessee. Mr. Shipton testified that this assignment was specifically made to cover a particular leasehold transaction, known as the "Bell delinquency." He further testified that Seaboard refused to apply these funds or said leasehold rental to the transaction specified and placed said funds in a general reserve account as collateral under the general pledge agreement.

The trial court found that defendant executed a general pledge agreement (Exhibit B) in favor of plaintiff. That document, according to its terms, pledged as security for any indebtedness to Seaboard all of the properties of Federal Leasing theretofore or thereafter delivered to Seaboard.

Reduced to its simplest terms, the first question here is: Did the execution of the general pledge agreement by the president of Federal Leasing at the request of Seaboard expand the use or application of the security that had been pledged for the performance of obligations in specific transactions with Seaboard so that such pledge might be applied as security against any loss that might be sustained in any one or more of the other transactions between the parties? This question must be answered in the affirmative.

A creditor in the position of Seaboard who determines that one or more of a series of separate transactions is going sour is confronted with a determination as to whether to go to the debtor and request that the latter secure the questionable

transactions by the good ones or to proceed against the debtor only on the transactions that are in default. The evidence reflects that Seaboard chose the former approach. When one of the 34 lease transactions between Seaboard and Federal Leasing became delinquent and in default, Seaboard solicited an agreement from Federal that the latter pledge its equity position in all 34 leases to secure any indebtedness that already existed or might later arise.

According to the testimony of Shipton, president of Federal Leasing, it was his understanding that, by executing the general pledge agreement, he was transferring the entire equity position of the defendant in all of the 34 leases to Seaboard as security against any loss that might be sustained in any one or more of said transactions. It is implicit in the court's order that it accepted Mr. Shipton's understanding of the transaction. This does not appear to be out of harmony with what Seaboard wanted to accomplish because in the early course of the dealings between the two companies Seaboard had been interested in obtaining Federal Leasing's signature to a general dealer agreement. One of the purposes for such an agreement was to ''criss-cross this collateral.'' This is simply an arrangement or method by which the good transactions are applied against the bad transactions. But since the president of Federal Leasing would not sign such an agreement, the general pledge agreement was used as an alternative. It is therefore clear that the purpose of both instruments was to furnish additional security to Seaboard to protect it against loss on the bad transactions by giving it the right to use the security in the good deals against any loss that might be sustained in any of the other transactions.

What has happened is simply an agreement to expand the use and applicability of the security pledged in particular transactions so that it serves as security for the entire group of transactions—that is to say, the entire equity position of defendant in the 34 transactions was security for any loss by Seaboard in any one or more of these transactions. The trial court was abundantly justified in taking this view of the evidence.

In an attempt to upset the effect of the trial court's ruling, plaintiff advances a number of arguments in a vain effort to show that no effective lien was created as a result of the general pledge agreement that was signed by Shipton, president of defendant:

█ (1) Plaintiff argues that nothing was delivered to it after the general pledge agreement was signed and therefore there was no valid pledge. The evidence is conflicting on this issue, but the law is well established that, when property is already in the possession of a pledgee, no redelivery to him is necessary in order to give effect to the agreement of pledge (*Smith* v. *Mott*, 76 Cal. 171 [18 P. 260]; 39 Cal.Jur.2d, Pledges, § 22).

█ (2) Defendant argues that unsecured promissory notes and unsecured guarantees cannot become subject of a pledge, and therefore are incapable of becoming a security. Plaintiff overstates its thesis on this point. Section 14, subdivision 3, Civil Code, reads: "The words 'personal property' include money, goods, chattels, things in action, and evidences of debt." Section 663, Civil Code, defines "Personal property" as "Every kind of property that is not real is personal."

Plaintiff's reliance on *Cline* v. *Berger*, 36 Cal.App.2d 353 [97 P.2d 855], in support of this point is misplaced. In that case, the debtor in addition to signing a contract as evidence of his debt, also executed a promissory note in favor of the creditor. When the creditor sued on the contract and levied an attachment, the debtor claimed that his promissory note in the creditor's favor constituted property that the creditor was holding as security for performance. The court rejected the creditor's argument as being wholly untenable. Suppose, however, the debtor in *Cline* had assigned to the creditor under a general pledge agreement a promissory note payable to the debtor signed by some third person, and that thereafter the debtor defaulted on his principal contract. In this factual context which is analogous to the case at bench, the creditor would first have to exhaust the security of the assigned promissory note before he could attach any property of the debtor.

At the time of the pledge, Seaboard admittedly possessed 34 leases, 34 mortgages, 68 promissory notes, and miscellaneous guarantees and trust deeds. It is obvious that all of these documents, with the exception of the promissory notes executed by defendant in favor of plaintiff, could properly become the subject of a pledge and therefore a security.

█ (3) Plaintiff also argues that all of the properties transferred to it by defendant were purchases made by plaintiff and that since it held title to them, no effective pledge as

to these items could be created by the general pledge agreement. This argument was made in the trial court but was abandoned by counsel when the judge pointed out that "The true situation is that it is a security type transaction."[1] The trial court was clearly justified in finding that these were security transactions and not sales.

(4) Finally, plaintiff argues that the general pledge agreement is invalid because not authorized by Federal Leasing's board of directors. Seaboard is not in any position to question Shipton's authority since the corporation received and retained benefits from the transaction. Also, the transaction was further ratified by the execution of the general power of attorney on September 28, 1964,[2] after this suit had been filed.

Since plaintiff was in possession of a security under the general pledge agreement which had not become valueless, the lower court properly dissolved and discharged the attachment.

The order is affirmed.

Jefferson, Acting P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 15, 1967.

---

[1]Counsel responded: "We did get security, there isn't any question about that."

[2]Mr. Lux, an officer of plaintiff, stated that the power of attorney would have been used in all 34 transactions, if necessary.